# EXHIBIT A

ROCKINGHAM SUPERIOR COURT

# CASE SUMMARY
## CASE NO. 218-2023-CV-00607

| | | | |
|---|---|---|---|
| **Jon Danos v  Frontier League Professional Baseball** | § | Location: | **Rockingham Superior Court** |
| | § | Filed on: | **05/12/2023** |
| | § | | |
| | § | | |

---

### CASE INFORMATION

| | |
|---|---|
| Case Type: | **Contract-Employment** |
| Case Status: | **05/12/2023  Pending** |

---

### PARTY INFORMATION

| | | |
|---|---|---|
| | | *Attorneys* |
| **Plaintiff** | **Danos, Jon** | **Walker, Jeremy T., ESQ** |
| | | *Retained* |
| | | 603-625-6464(W) |
| | | |
| **Defendant** | **Frontier League Professional Baseball** | |

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 05/12/2023 | Complaint - Civil<br>Filed by:  Plaintiff  Danos, Jon<br>*Jury Trial* | *Index #1* |
| 05/25/2023 | Summons on Complaint<br>*env #3005361* | *Index #2* |
| 05/25/2023 | **Service**<br>Frontier League Professional Baseball        unserved | |

Filed
File Date: 5/12/2023 9:21 AM
Rockingham Superior Court
E-Filed Document

THE STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS                                              SUPERIOR COURT

218-2023-CV-00607

Case No. _____

JON DANOS
5 Blakes Lane, Hampton Falls,
New Hampshire 03844

v.

FRONTIER LEAGUE PROFESSIONAL BASEBALL
2041 Goose Lake Road, Suite 2A,
Sauget, Illinois 62206

**COMPLAINT
AND REQUEST FOR A JURY TRIAL**

Plaintiff, Jon Danos, by his undersigned attorneys, McLane Middleton, Professional

Association, hereby complains against the Defendant, Frontier League Professional Baseball. as

follows:

**INTRODUCTION**

1.      This lawsuit seeks to right the wrongs that have resulted from a professional

sports league's coordinated campaign to secure as CEO an experienced professional sports

executive and administrator to both lead the fledgling league through a time of global crisis and

to use his expertise to maximize the league's financial stability and growth without paying the

proper and contractually obligated compensation to that CEO.

2.      This complaint raises New Hampshire state law claims for unlawful discharge,

breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair

dealing. All of these claims are the result of breaches of the employment contract between Jon

1

Danos ("Mr. Danos" or "Plaintiff") and the Frontier League ("Frontier," "the League" or "Defendant").

3.      In early 2021, Frontier faced many significant issues unique to a professional sports league. Frontier had recently completed a merger and was struggling to raise revenue due to inconsistent attendance as a result of the then-ongoing COVID-19 pandemic. Further, two Canadian teams were unable to participate in the league in their normal capacity as a result of Canadian policy restricting travel to and from the United States. Frontier was also entering its first season as a Major League Baseball ("MLB") Partner League and embarking on its first season post-merger, which would require Frontier to put out its best possible product in order to maintain the partnership with MLB and to earn support from its member communities. All the while, MLB had restructured the landscape of Minor League Baseball by ending affiliation with 42 Minor League teams. These unique problems could only be resolved by someone with a very specific skillset and experience.

4.      Mr. Danos was one of the only candidates that possessed the skillsets and experience to resolved the issues facing Frontier as described in Paragraph 3.

5.      Knowing that Mr. Danos was the best, and potentially the only, candidate matching Frontier's needs, Frontier aggressively pursued Mr. Danos for the position of CEO in early 2021. During that time, Frontier and Mr. Danos negotiated an employment agreement in Mr. Danos's home state of New Hampshire. Mr. Danos, negotiating in good faith, agreed to terms which both incentivized Frontier to terminate the agreement unilaterally and without cause, and incentivized Mr. Danos to maximize Frontier's revenue through a commission provision.

6.      Representatives for Frontier expressly stated that Frontier would never use the termination clause in the agreement without cause, which induced Mr. Danos to sign an agreement with that termination clause.

7.      Representatives for Frontier expressly allowed Mr. Danos to operate in his role from his home state of New Hampshire, rather than requiring him to relocate in order to serve in the position.

8.      Despite entering many deals which improved Frontier's finances and taking steps to ensure that Frontier's on and off-field product remained competitive and viable in professional baseball, Frontier terminated Mr. Danos's contract without cause on March 16, 2022.

9.      Plaintiff seeks the salaried pay he should have received through April 30, 2024, payment of his contractual commission from benefits he secured for Frontier, and restitution damages.

## PARTIES

10.      Mr. Danos is a resident of New Hampshire, with his permanent residence located at 5 Blakes Lane, Hampton Falls, New Hampshire 03844.

11.      Frontier is an Ohio corporation with its principal place of business located at 2041 Goose Lake Road, Suite 2A, Sauget, Illinois 62206.

## JURISDICTION AND VENUE

12.      The Court has subject matter jurisdiction over these claims pursuant to RSA 491:7. Furthermore, Plaintiff seeks damages within the jurisdictional limits of this Court.

13.      Venue is appropriate pursuant to the RSA 502-A:16 and because Plaintiff resides in Rockingham County.

14.     This Court has personal jurisdiction over Frontier pursuant to RSA 293-A:15.10 and RSA 510:4 based on Frontier's minimum contacts with New Hampshire. *See also McClary v. Erie Engine & Mfg. Co.*, 856 F. Supp. 52, 55-56 (D.N.H. 1994) ("[T]he court concludes that RSA 293-A:15:10 is the new long-arm statute governing jurisdiction over foreign corporations in New Hampshire. . . [and the New Hampshire Legislature has] demonstrate[d] that it intended RSA 293-A15.10 to authorize jurisdiction over foreign corporation to the full extent allowed by federal law."). *See also id.* at 55 n.2 ("[F]oreign corporation is defined [in RSA 293-A:1.40(10)] as a corporation for profit incorporated under a law other than the law of this state." (internal quotations and citations omitted).

## FACTS

15.     Prior to joining Frontier, Mr. Danos had approximately 28 years of experience in professional baseball and athletics administration. The relevant prior experience includes:

      a.   From 1993 to 2003, Mr. Danos served in management role with Maryland Baseball, LLC, the owner/operator of three Baltimore Orioles minor league affiliates. During that time, Mr. Danos served as Assistant General Manager and General Manager of the Bowie Baysox, the AA affiliate of the Baltimore Orioles. Mr. Danos's position with the Baysox required him to help build the Baysox brand, assess the long-term viability of Bowie as a long term minor league baseball market. In December 1995, Mr. Danos became a Senior Executive of Maryland Baseball, LLC, during which time he helped assess market feasibility for minor league baseball in other communities such as in York, PA and Salisbury, MD markets and launch Orioles minor league affiliates and independent league teams in both markets.

b.  From 2003 to 2015, Mr. Danos served as the President, a Partner, and Chief
    Operating Officer of Opening Day Partners, LLC, a Lancaster, PA
    corporation that owned five independent Atlantic League baseball teams.
    Mr. Danos served on the Atlantic League Board of Directors executive
    committee, among those leading the league's unprecedented growth.  During
    that time, Mr. Danos negotiated ballpark development and lease agreements,
    recruited and hired front office officials and head coaches for each of the five
    teams owned by Opening Day Partners. Mr. Danos served on the Executive
    Committee of the Atlantic League as  Chair of the Search Committee.  The
    Search Committee hired the Atlantic League president following a
    nationwide search.  Mr. Danos's position also required him to lead revenue
    generation efforts, which included the generation of $23 million in annual
    revenue, $10+ million in gross annual food, beverage, catering and
    merchandise revenue, and increasing corporate sponsorship by roughly
    $5,800,000 in 7 years.  Mr. Danos' efforts contributed to unprecedented
    valuations and sales of independent minor league baseball teams.

c.  From August 2015 to April 2021, Mr. Danos worked for the University of
    New Hampshire's Athletics Department. From August 2015 to August 2017,
    Mr. Danos worked as the University's Senior Associate Athletic Director for
    External Affairs, a position where he oversaw the University's athletics
    revenue generations, including but not limited to ticket sales, marketing,
    promotions, television and radio contracts, and merchandising. In September
    of 2017, Mr. Danos was promoted to Executive Director of Athletics for the

5

University, and his role expanded to include significant profit and loss

management, alumni relations, long term strategy and planning, and

department administration for twenty D-1 teams.

16.    Mr. Danos continued to successfully serve as the Executive Director of Athletics

for the University of New Hampshire until April 2021.

17.    Throughout 2021, Frontier pursued Mr. Danos for the position of the league's

chief executive officer based primarily on his many years of experience in baseball and athletics

administration.

18.    On April 6, 2021, Mr. Danos provided John Stanley, Frontier's President at the

time, a memorandum ("Danos Memo") outlining Mr. Danos's proposed strategy for his tenure as

CEO if he was selected for the position. Mr. Danos often highlighted the proposals in the Danos

Memo as actions he would take as CEO throughout the interview process. The proposals in the

Danos Memo focused primarily on actions that would generate revenue for Frontier.

19.    The Danos Memo stated that Mr. Danos would likely pursue broadcast/streaming

agreements for Frontier.

20.    Mr. Danos continuously noted his proposal of pursuing broadcast/streaming

agreements for Frontier throughout the interview process.

21.    On or about April 26, 2021, Frontier publicly announced that Mr. Danos would be

Frontier's new Chief Executive Officer ("CEO").  An official report of the announcement can be

accessed at https://www.baseballamerica.com/stories/frontier-league-names-jon-danos-as-new-
ceo/.

22.     On or about May 1, 2021 and after extensive negotiations taking place with Mr. Danos in his New Hampshire residence, Mr. Danos and Frontier entered an Employment Contract ("Agreement") which named Mr. Danos as CEO of Frontier.

23.     Frontier agreed during negotiations that Mr. Danos would remain in his New Hampshire residence while serving as CEO for Frontier.

24.     Throughout his tenure as CEO of Frontier, Mr. Danos primarily operated out of his New Hampshire residence.

25.     While Frontier's CEO, Mr. Danos oversaw an agreement between Frontier and FloSports, a live sporting events streaming service. The owners of the Frontier teams voted unanimously to approve this agreement. The three-year deal made Frontier a grand total of $337,500, with two subscription milestones of $25,000 each.

26.     Since this time, two other independent leagues have secured deals with FloSports as Mr. Danos' agreement was recognized by other leagues as lucrative and beneficial.

27.     Upon information and belief, the first level of bonuses owed to Frontier based on FloSports's subscriber totals is likely to be reached in 2022.

28.     The Danos Memo stated that Mr. Danos would likely pursue purchasing agreements for Frontier that would reduce costs based on volume purchasing. Mr. Danos also repeated this proposal throughout the interview process.

29.     While Frontier's CEO, Mr. Danos negotiated a deal with Entegra, a Food Group Procurement Organization. As part of this deal, Frontier clubs could opt in and exchange their historical data about the purchase of food, beverage, and facility goods and inventory, and Entegra would provide those same goods at substantial club savings.

30.     While Mr. Danos was still CEO for Frontier, eight Frontier teams engaged with Entegra and used Entegra's analysis.

31.     The estimated savings from the Entegra analysis is an average of $27,000 per month per club during the baseball season.

32.     The Frontier League season lasts from May until August.

33.     At the time of Mr. Danos's termination, he was helping Frontier secure a leaguewide deal to use Entegra and implement their analysis.

34.     Assuming all 15 Frontier teams with a dedicated home stadium implemented Entegra's analytics as a result of the deal that Mr. Danos helped to negotiate, the total savings are estimated at $1,620,000.

35.     During the interview process, Mr. Danos touted the profitability of collecting and monetizing the on-field analytics of all Frontier games.

36.     During his time as Frontier CEO, Mr. Danos started and was continuously engaged in negotiations with Yakkertech/Baseball Cloud, two companies specializing in the production of on-field baseball analytics (which have since merged, collectively "Yakkertech").

37.     Mr. Danos sought this deal to ensure that all Frontier teams could aggregate such data, which could then be monetized and sold in ways that benefit Frontier, including but not limited to selling this data to MLB to aid in the MLB scouting Frontier players.

38.     As part of negotiations with Yakkertech, Yakkertech agreed that Frontier's potential deal would involve a profit split between Yakkertech and Frontier any time the data was sold or sponsored.

39.     On information and belief, Major League Baseball pays Trackman, a company similar to Yakkertech, $300,000 per year to access similar data from the Atlantic League of Professional Baseball that Trackman compiles.

40.     During the interview process, Mr. Danos touted that Frontier's status as an MLB affiliate league could lead to an increase in value that MLB will pay when purchasing the rights of Frontier players.

41.     At the start of Mr. Danos's tenure as Frontier's CEO, Major League Baseball paid $5,000 whenever they purchased the rights to a Frontier player.

42.     At the end of Mr. Danos's tenure as Frontier's CEO, Major League had agreed to pay $15,000 whenever they purchased the rights to a Frontier player.

43.     In 2021, Major League Baseball purchased the rights to roughly 42 Frontier players.

44.     While still Frontier's CEO, Mr. Danos oversaw Frontier's selection of a new web host and statistics provider that saved the league approximately $30,000 per year.

45.     While still Frontier's CEO, Mr. Danos assisted in the re-negotiation of the Frontier League Winter camp, which earned Frontier $10,000 this past year.

46.     As stated in Paragraph 3, Frontier aggressively pursued Mr. Danos for the position because Frontier faced many challenges unique to a professional sports league during that time, and because Mr. Danos was the only candidate with the specific skillset and experience to match Frontier's needs.

47.     In an effort to expand the Frontier League and accomplish a record-setting $1,000,000 valuation for a Frontier League expansion team for Atlantic City, NJ, Mr. Danos

agreed to terms and secured a line of credit with a prospective ownership group which included the former CEO of a New York Stock Exchange listed company.

48.    During Mr. Danos's tenure as Frontier's CEO, Mr. Danos secured many financial benefits for Frontier, outlined in Paragraphs 26 through 46.

49.    The terms in the Agreement were intentionally left vague as to how Mr. Danos's commission would be calculated, with the understanding that the calculation of the commission would be negotiated in good faith during Mr. Danos's tenure as CEO. This vagueness served to incentivize both parties, as it motivated Mr. Danos to secure as many benefits as possible for Frontier so that he would have bargaining power when negotiating a higher commission.

50.    Prior to March 14, 2022, General Counsel for Frontier stated to Mr. Danos that General Counsel for Frontier would reach out to Frontier members and other leagues and determine a proper calculation for Mr. Danos's commission based on the commission of other similarly situated executives in other independent baseball leagues.

51.    Prior to March 14, 2022, General Counsel for Frontier stated to Mr. Danos that General Counsel for Frontier had been unable to finalize the calculation of Mr. Danos's commission because General Counsel for Frontier had never followed up on his prior promise to reach out to other leagues.

52.    On or about March 14, 2022, Mr. Danos spoke with General Counsel for Frontier to discuss his commission.

53.    During this call, General Counsel for Frontier told Mr. Danos that Mr. Danos should discuss with other similarly situated CEO's the terms and values of their respective commissions and reach back out to General Counsel for Frontier.

54.    On or about March 14, 2022, based on communications with other CEOs, Mr. Danos provided General Counsel for Frontier with an estimation that his commission should be worth approximately 20% of the revenue, expansion fees, and savings he secured for Frontier.

55.    On March 16, 2022 and after Mr. Danos provided the 20% estimate to General Counsel for Frontier, Mr. Danos received a call from General Counsel for Frontier. Present on this call also were Tom Kramig and Brian Lyter, two officers for Frontier. During this call, Mr. Lyter, Mr. Kramig, and General Counsel terminated the Agreement without cause on behalf of Frontier.  No written termination was ever provided.

56.    Although Frontier agreed to negotiate the calculation of Mr. Danos's commission payment in good faith, no substantive negotiations ever occurred and Mr. Danos's employment was summarily terminated when he brought the topic up.

57.    Section 1 of the Agreement provided that the Agreement would commence on May 1, 2021, and would expire on April 30, 2024, except as described in Section 4 of the Agreement.  Section 1 of the Agreement also stated that either Mr. Danos or Frontier could terminate, extend, or modify the Agreement via mutual agreement at any time.

58.    Section 3 of the Agreement provided for Mr. Danos's compensation while serving as the Chief Executive Officer of Frontier.

59.    Subsection b. of Section 3 of the Agreement set Mr. Danos's commission based on his efforts to promote Frontier's growth, including: revenue generated through expansion/new membership fees; revenue generated through league sponsorships or agreements with third parties; revenue or subsidies from MLB that may be obtained to offset expansion or other League fees, etc.; and monies saved with the League's suppliers.

60.     Subsection b. of Section 3 of the Agreement explicitly states that Mr. Danos's commissions will be negotiated in good faith.

61.     Section 4 of the Agreement provides Frontier with the ability to terminate Mr. Danos's employment.

62.     Section 4 of the Agreement states that Frontier may terminate the Agreement at any time for cause.   Cause is defined as "Mr. Danos's gross insubordination, indecent acts, fraudulent conduct, unlawful behavior, giving notice to resign, intentional failure to perform duties, or violation of Section 5 [Duty of Loyalty/Outside Activities] or 6 [Confidential and Proprietary Information] this agreement [sic]"

63.     Section 4 of the Agreement also states that Frontier can terminate the Agreement without cause.  If Frontier terminates this Agreement without cause prior to April 30, 2022, then "Mr. Danos shall still receive his compensation described in Sections 3a and 3c . . . through April 30, 2022."  If Frontier terminates this Agreement without cause on or after May 1, 2022, then "Mr. Danos shall receive his compensation described in Sections 3a and 3c, above, through April 30, 2024."

64.     On several calls negotiating the Agreement, General Counsel for Frontier, the stated that the termination option in Section 4 of the Agreement was something that Frontier would never invoke, which induced Mr. Danos to agree to the term. These calls included members of Frontier's Search Committee, which spearheaded the effort to find Frontier's CEO.

## <u>COUNT I: BREACH OF CONTRACT FOR LACK OF PROPER NOTICE OF TERMINATION</u>

65.     Paragraphs 1 through 63 are incorporated by reference herein.

66.     Under New Hampshire law, notice of termination should be clear and unequivocal so that the parties to the parties of the contract know without question their relations are no

12

longer governed by its terms. *City of Dover v. International Ass'n of Firefighters, Local 1312*, 114 N.H. 481, 484 (N.H. 1974).

67.    Clear and unequivocal notice of termination is not explicitly defined in an employment sense, but New Hampshire case law suggests that memorializing termination of a contractual agreement in writing satisfies the requirement of clear an unequivocal notice of termination. *See Motion Motors, Inc. v. Berwick*, 150 N.H. 771, 780 (N.H. 2004).

68.    Frontier never provided Mr. Danos with clear written notice that his contract would be terminated. Rather, he received a call from Frontier's counsel and two Officers stating that they were exercising an option to terminate the Agreement without cause.

69.    Mr. Danos did not receive an official end date for his time with Frontier, and was expected to engage in some of his duties with Frontier after April 30, 2022.

70.    Based on Frontier's failure to provide clear and unequivocal notice of termination and Frontier's expectation that Mr. Danos would continue to perform some of his duties after April 30, 2022, Mr. Danos should have received salaried pay reflecting what he would have accumulated between April 2022 and April 30, 2024.

## COUNT II: WRONGFUL TERMINATION

71.    Paragraphs 1 through 69 are incorporated by reference herein.

72.    Under New Hampshire law, a claim of wrongful termination is established where the plaintiff can show both that a defendant "was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment," and that the plaintiff "was discharged because he performed an act that public policy would encourage or refused to do something that public policy would condemn." *See Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915, 921 (N.H. 1981); *see also Conkey v. Town of Dorchester*, 2015 N.H. Lexis 301, at *8 (N.H. 2015).

73.     Other courts have noted that when an employer "seeks to deprive the [employee] of all compensation by terminating the contractual relationship when the [employee] is on the brink of successfully completing [an event that may increase the employee's compensation], the [employer] has acted in bad faith." *See generally Fortune v. National Cash Register Co.*, 373 Mass. 96 (Mass. 1977); *see also Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915 (N.H. 1981) (New Hampshire court recognizing *Fortune* as a legitimate claim for wrongful termination).

74.     Frontier terminated Mr. Danos's employment only after he proposed that Frontier provide him with 20% revenue/savings as his commission, which establishes that Frontier terminated his employment in bad faith.

75.     Mr. Danos carrying out his duties exactly as explicitly stated by his contract is clearly encouraged by public policy.

76.     Based on the factual allegations contained herein, Mr. Danos was wrongfully terminated.

## COUNT III: UNJUST ENRICHMENT

77.     Paragraphs 1 through 77 are incorporated by reference herein.

78.     New Hampshire recognizes an action for unjust enrichment where an individual receives a benefit which would be unconscionable to retain. *See Turner v. Shared Towers VA, LLC*, 167 N.H. 196, 202 (N.H. 2014).

79.     The action for unjust enrichment "lies in a promise, implied by law, that one will restore to the person entitled thereto that which in equity and good conscience belongs to him." *See Appeal of Granite State Elec. Co.*, 120 N.H. 536, 539 (N.H. 1980).

14

80.     Although the terms of the Agreement do not establish a clear compensation that Mr. Danos was rightfully owed for any benefits that he conferred on Frontier, the Agreement specifically acknowledges that Mr. Danos's commission would be negotiated in good faith in a way that reflects any revenue or savings that Mr. Danos created for Frontier.

81.     The business deals described in Paragraphs 21 through 46 demonstrate the benefit that Mr. Danos secured for Frontier.

82.     Even after Mr. Danos's termination, Frontier retains the benefits described in Paragraph 26 through 46 secured by Mr. Danos.

83.     To the extent that Frontier disputes that the revenues and savings that Mr. Danos created for Frontier should have been included in Mr. Danos's compensation, Mr. Danos requests restitution damages based on unjust enrichment, as Mr. Danos conferred benefits on Frontier that he was supposed to receive some level of compensation for.

## COUNT IV: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

84.     Paragraphs 1 through 84 are incorporated by reference herein.

85.     New Hampshire recognizes a common law "good faith contractual obligation." *See J & M Lumber and Const. Co. Inc. v. Smyjunas*, 161 N.H. 714, 724 (N.H. 2011) (quoting *Centronic Corp. v. Genicom Corp.*, 132 N.H. 133, 138 (N.H. 1989).

86.     New Hampshire's case law on common law good faith and fair dealing includes a series of doctrines which have been recognized to include obligations of good faith during (1) contract formation, (2) termination of at-will employment, and (3) limitation of discretion in contractual performance.  *Smyjunas*, 161 N.H. at 724 (citing *Livingston v. 18 Mile Point Drive*, 158 N.H. 619, 624 (N.H. 2009).

87. The covenant of good faith is "an obligation implied into an employment contract that otherwise would be terminable at will[,]" which intends to ensure that, "the parties [in every contractual relationship] will carry out their obligations in good faith." *Syjunas*, 161 N.H. at 725 (citing *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 132-33 (N.H. 1974)). *See also Cloutier v. A & P Tea Co., Inc.*, 121 N.H. 915, 920 (N.H. 1981) ("The rationale underlying *Monge* is that there is an implied covenant in every contractual relationship that the parties will carry out their obligations in good faith.").

88. Frontier represented that it would negotiate in good faith Mr. Danos's commission, as required in the Agreement, and represented that it would not execute the clause in the Agreement which would allow Frontier to terminate Mr. Danos without cause.

89. When Mr. Danos sought to negotiate the terms of his commission in good faith, Frontier instead unceremoniously terminated Mr. Danos's employment contract without cause and without paying him his owed commission while retaining all the benefits that Mr. Danos secured for Frontier.

90. Frontier's use of the clause as described in Paragraph 89 is clearly in opposition to Frontier's representations during contract negotiations with Mr. Danos that induced Mr. Danos to agree to such a term.

91. Frontier's actions as alleged in the complaint amount to a breach of the common law covenant of good faith and fair dealing implied into all employment contracts in New Hampshire.

## <u>REQUEST FOR A JURY TRIAL</u>

Plaintiff hereby requests a trial by jury on all claims for damages and other matters for which it is entitled to a jury trial.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Jon Danos, pursuant to New Hampshire law and this Court's equitable powers, requests that this Court:

a.   Award Plaintiff the salaried pay he should have received through the life of the Agreement, from April 1, 2022 until April 30, 2024, calculated as $395,833.33.

b.   Award Plaintiff the commission he should have received pursuant to subsection b. of Section 4 of the Agreement, which was to be negotiated in good faith and which Plaintiff estimates as $420,000, or 20% of the savings and revenue he conferred upon Defendant as a result of the benefits secured by Mr. Danos, discussed herein in Paragraphs 26 through 46.

c.   In the alternative, Award Plaintiff equitable restitution for the benefits which Plaintiff conferred upon Defendant in the savings and revenue he created for Defendant as part of his employment contract with Defendant.

d.   Award any and all other relief this Court deems just and proper in this circumstance.

Respectfully submitted,

Jon Danos

By His Attorneys,

McLANE MIDDLETON,
    PROFESSIONAL ASSOCIATION

Date:    5/12/2023                By: /s/ Jeremy T. Walker
                                 Jeremy T. Walker,  NH Bar No. 12170
                                 900 Elm Street, P.O. Box 326
                                 Manchester, New Hampshire 03105
                                 Telephone (603) 625-6464

                                 Jeremy.walker@mclane.com

                                 And


                                     Stanley E. Woodward, Jr.
                                     Stan M. Brand
                                     Mark P. Nobile
                                     BRAND WOODWARD, ATTORNEYS AT LAW
                                     1808 Park Road NW
                                     Washington, D.C. 20010
                                     (202) 996-7447 (telephone)
                                     (202) 996-0113 (facsimile)
                                     Stanley@BrandWoodwardLaw.com

                                     Counsel for Plaintiff Jon Danos
                                     (*Pro Hac Vice* appearance to be sought)

18

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH  03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## SUMMONS IN A CIVIL ACTION



Case Name:    **Jon Danos v  Frontier League Professional Baseball**
Case Number:   **218-2023-CV-00607**

Date Complaint Filed: May 12, 2023
A Complaint has been filed against Frontier League Professional Baseball in this Court. A copy of the Complaint is attached.

## The Court ORDERS that ON OR BEFORE:

July 09, 2023 — Jon Danos shall have this Summons and the attached Complaint served upon Frontier League Professional Baseball by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law.

July 30, 2023 — Jon Danos shall electronically file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice.

30 days after Defendant is served — Frontier League Professional Baseball must electronically file an Appearance and Answer or other responsive pleading form with this Court.  A copy of the Appearance and Answer or other responsive pleading must be sent electronically to the party/parties listed below.

**Notice to Frontier League Professional Baseball:** If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:

Jeremy T. Walker, ESQ — McLane Middleton Professional Association 900 Elm St 10th FL PO Box 326 Manchester NH  03105-0326

Frontier League Professional Baseball — 2041 Goose Lake Road Suite 2A Sauget IL  62206

BY ORDER OF THE COURT

May 25, 2023

Jennifer M. Haggar
Clerk of Court

(126954)

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH  03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## JON DANOS
## INSTRUCTIONS FOR SERVICE
## BY THE SHERIFF'S DEPARTMENT

Case Name:    **Jon Danos v  Frontier League Professional Baseball**
Case Number:    **218-2023-CV-00607**

**Instructions for:** Jon Danos

The attached Summons must be sent to the Sheriff's Department for service.  Service must be completed on or before **July 09, 2023**.

**Further action is required by you**
**You must:**
- **Print two copies of the Summons per defendant**
- **Print two copies of the Notice to Defendant per defendant**
- **Print two copies of the Complaint filed with the Court per defendant**
- **Make two packets for service.  Each packet should contain:**
  - **One Summons**
  - **Once Notice for Defendant**
  - **One Complaint filed with the Court**
- **Mail or hand deliver the packets to the Sheriff's Department in the county where each defendant resides.**

**Sheriff Departments in New Hampshire:**

Belknap County Sheriff's Department:

Carroll County Sheriff's Department:

Cheshire County Sheriff's Department:

Coos County Sheriff's Department:

Grafton County Sheriff's Department:

Hillsborough County Sheriff's Department:

Merrimack County Sheriff's Department:

Rockingham County Sheriff's Department:

Strafford County Sheriff's Department:

Sullivan County Sheriff's Department:

**\*If one or more of the parties resides out of state, please click here for the requirements\***
Service must be made upon the defendant before **July 09, 2023**.

If the Sheriff is unable to complete service by **July 09, 2023** you will receive a "Notice of Incomplete Service" from the Sheriff's Department.  You may request that new paperwork be issued by electronically filing a Request for Documents.  There is a fee for this request.

The Sheriff will mail the 'Return of Service' to you.  You MUST electronically file the 'Return of Service' with the court by July 30, 2023.

**If service is not made as directed, no further action will occur and the case may be dismissed by the court.**

NHJB-2678-Se (07/01/2018)

# Important Service Information for Sheriff
## <u>Do not file this with the court</u>
Provide this information to the Sheriff's Department.
See Instructions for Service for more information.
### PLEASE PRINT CLEARLY

Date: _____         Case #: _____

### <u>Who are you requesting to be served?</u>
Please provide whatever information you know

Name: _____

Address for service (no P.O. boxes):

_____         APT #: _____

_____

Home phone #: _____    Cell phone #: _____

Sex: ☐ Male   ☐ Female         Race: _____

Last 4 digits of SS#: xxx-xx-  _____  _____  _____  _____        D.O.B. _____

Work name & address:

_____

Special instructions for service (i.e. directions, best time to serve, cautions, etc.):

_____

_____

Vehicle description/license plate:

_____

### <u>Your Information:</u>
Name (please print): _____

Residential address:                    Mailing address:

_____        _____

_____        _____

Phone number to contact you during business hours:

_____ Alternate #: _____

_____
Signature

### ♦IN-HAND SERVICE WILL INCUR EXTRA COSTS DUE TO ADDITIONAL TRAVEL♦

### SHERIFF OFFICE USE ONLY: (This will vary by Sheriff's Office)

Fees Paid: $_____    Cash #: _____    Check#: _____
Id#: _____  Waiver: _____  Money Order#: _____    Credit Card: _____
Sheriff File # _____    Authorization #: _____

NHJB-2678-Se (07/01/2018)

Instructions for filing the Return of Service:

If you are working with an attorney, they will guide you on the next steps. If you are going to represent yourself in this action, go to the court's website: www.courts.state.nh.us, select the Electronic Services icon and then select the option for a self-represented party.

1. Select "I am filing into an existing case". Enter 218-2023-CV-00607 and click Next.

2. When you find the case, click on the link follow the instructions on the screen. On the "What would you like to file?" screen, select "File Other Document" and choose "Return of Service".

3. Scan the Return of Service packet and follow the instructions in the electronic filing program to upload the Return of Service to complete your filing.

4. If the sheriff was unable to serve the paperwork, you can request new paperwork by filing a Request for Documents. On the "What would you like to file?" screen, select "File Other Document" and choose "Request for Reissued Summons" from the menu and upload the Request for Documents form.

**FAILURE TO FILE THESE DOCUMENTS MAY RESULT IN YOUR CASE BEING DISMISSED.**

May 25, 2023                                          Jennifer M. Haggar
Date                                                        Clerk of Court

You can access documents electronically filed through our Case Access Portal by going to https://odypa.nhecourt.us/portal and following the instructions in the User Guide. In that process you will register, validate your email, request access and approval to view your case. After your information is validated by the court, you will be able to view case information and documents filed in your case.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH  03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE TO DEFENDANT

Case Name:      **Jon Danos v  Frontier League Professional Baseball**
Case Number:    **218-2023-CV-00607**

You have been served with a Complaint which serves as notice that this legal action has been filed against you in the **Rockingham Superior Court.**  Review the Complaint to see the basis for the Plaintiff's claim.

Each Defendant is required to electronically file an Appearance and Answer 30 days after service. You may register and respond on any private or public computer.  For your convenience, there is also a computer available in the courthouse lobby.

If you are working with an attorney, they will guide you on the next steps.  If you are going to represent yourself in this action, go to the court's website: www.courts.state.nh.us, select the Electronic Services icon and then select the option for a self-represented party.

1.  Complete the registration/log in process.  Click Register and follow the prompts.

2.  After you register, click Start Now.  Select **Rockingham Superior Court** as the location.

3.  Select "I am filing into an existing case".  Enter **218-2023-CV-00607** and click Next.

4.  When you find the case, click on the link and follow the instructions on the screen.  On the "What would you like to file?" screen, select "File a Response to Civil Complaint".  Follow the instructions to complete your filing.

5.  Review your Response before submitting it to the court.

**IMPORTANT:** After receiving your response and other filings the court will send notifications and court orders electronically to the email address you provide.

A person who is filing or defending against a Civil Complaint will want to be familiar with the Rules of the Superior Court, which are available on the court's website: www.courts.state.nh.us.

Once you have registered and responded to the summons, you can access documents electronically filed by going to https://odypa.nhecourt.us/portal and following the instructions in the User Guide.  In that process you will register, validate your email, request access and approval to view your case. After your information is validated by the court, you will be able to view case information and documents filed in your case.

If you have questions regarding this process, please contact the court at 1-855-212-1234.